FILED & ENTERED

JUL 30 2025

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY fisherl     DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>LISA FANCHER,<br><br>      Debtor.<br>_____<br><br>LOUIS MAYORGA,<br><br>               Plaintiff,<br><br>  v.<br><br>LISA FANCHER, an individual doing business as Frontier Records and American Lesions Music, and BMG RIGHTS MANAGEMENT (US) LLC,<br><br>              Defendants. | Case No.: 1:23-bk-10324-VK<br><br>Chapter 13<br><br>Adv. No.: 1:23-ap-01026-VK<br><br>**MEMORANDUM OF DECISION AFTER TRIAL**<br><br><u>Trial:</u><br>Date:    March 24-28, 2025<br>Time:    10:00 a.m.<br>Place:   Courtroom 301<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA 91367<br><br><u>Closing Arguments:</u><br>Date:    April 17, 2025<br>Time:    2:00 p.m.<br>Place:   Courtroom 301<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA 91367 |

On March 24 through March 28, 2025, the Court conducted a trial in the above-captioned adversary proceeding. Eduardo Martorell and Jesse Belmontes appeared on behalf of plaintiff Louis Mayorga. Michael Ackerman and Catherine Liu appeared on behalf of defendant Lisa Fancher.

The Court has jurisdiction over the adversary proceeding commenced by the filing of plaintiff's *First Amended Complaint* [doc. 24]. The matter in controversy is a core proceeding. Venue is proper pursuant to 28 U.S.C. § 1409.

For the reasons set forth below, the Court will enter judgment in favor of plaintiff Louis Mayorga under 11 U.S.C. § 523(a)(2)(A) and in favor of defendant Lisa Fancher under 11 U.S.C. § 523(a)(4). This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law.[1]

## I.    BACKGROUND

This adversary proceeding concerns a dispute regarding royalties owed to a member of a punk rock band for his performance in the band's sound recordings. The defendant is the owner of the record label who was contractually obligated to pay those royalties to the members of the band.

A royalty is "a payment—in addition to or in place of an up-front payment—made to an author … for each copy of a work or article sold under a copyright…." *Royalty*, *Black's Law Dictionary* (12th ed. 2014). "Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights." *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248–49 (C.D. Cal. 2002) (citing 17 U.S.C. § 102(a)(2), (7)), *aff'd,* 349 F.3d 591 (9th Cir. 2003). "A musical composition captures an artist's music in written form" and "consists of rhythm, harmony, and melody." *Id*. at 1249. "A sound recording is the sound produced by the performer's rendition of the musical [composition]." *Id*.

---

[1] The Court may take judicial notice of the bankruptcy case and adversary proceeding dockets. The facts are derived from testimony at trial and/or when so cited, from a pleading from these dockets, admitted testimony from trial declarations and exhibits admitted at trial.

### A.      The Parties

Lisa Fancher is a sole proprietor doing business as "Frontier Records." Frontier Records is an independent record label with a focus on music in the punk rock genre. Ms. Fancher also does business as "American Lesion Music," a music publisher. *Statement of Financial Affairs*, ¶ 27 [1:23-bk-10324-VK, doc. 1]. Ms. Fancher founded Frontier Records in 1980. *Id.*; *Trial Witness Declaration of Lisa Fancher* ("Fancher Decl."), ¶ 1 [doc. 165]. She founded American Lesion Music in 1981. *Id.* Apart from a part time employee, who assisted with inventory and shipping orders, Ms. Fancher ran her businesses by herself. *Id.*, ¶ 9. On March 16, 2023, Ms. Fancher filed a voluntary chapter 13 petition, initiating case no. 1:23-bk-10324-VK.

Louis "Louiche" Mayorga is songwriter and musician. He plays bass guitar. At age 19, Mr. Mayorga was one of four founding members of Suicidal Tendencies (the "Band"), a band that played in the hardcore punk rock genre. *Joint Pretrial Stipulation*, Section A, ¶ 1 [doc. 155]. The Band's three other founding members were Michael "Mike" Muir, Grant Estes and Amery Smith. Glen E. Friedman was the Band's manager; he sometimes was referred to as the fifth member of the Band.[2]

### B.      The Album

On July 5, 1983, Ms. Fancher released the Band's self-titled debut album, *Suicidal Tendencies* (the "Album"). Mr. Mayorga and Mr. Muir composed four songs on the Album: "Institutionalized," "I Want More," "Two Sided Politics" and "Won't Fall in Love Today" (collectively, the "Mayorga Songs").

"Institutionalized" is the Band's most popular song. *Trial Witness Declaration of Louis Mayorga* ("Mayorga Decl."), ¶ 3 [doc. 158]. It has been used in several films and television series, including *Repo Man* (1984), "Free Verse," an episode in the second season of *Miami Vice* (1986), "Couch-Fishing," an episode in the third season of *Beavis and Butt-Head* (1993), *The Brady Bunch Movie* (1995), and *Iron Man* (2008).

---

[2] In 1991, Mr. Mayorga sued Mr. Muir and Ms. Fancher. Ms. Fancher testified that the lawsuit was mostly between Mr. Mayorga and Mr. Muir; she was "not the main target." This lawsuit was later settled. Mr. Mayorga and Ms. Fancher testified that after the 1991 lawsuit, they remained friendly.

On April 1, 1988, Mr. Mayorga left the Band. According to Mr. Mayorga, he was kicked out by the other members of the Band. In 1993, the Band re-recorded and re-released the Album with the label Epic Records, using the album title *Still Cyco After All These Years*. Because Mr. Mayorga did not perform on *Still Cyco After All These Years*, he is not entitled to sound recording royalties for that version of the Album.

### C.    *The Recording Agreement*

On April 28, 1983, all four members of the Band, including Mr. Mayorga, entered into a recording agreement (the "Recording Agreement") with Ms. Fancher [Ex. 6]. Under the Recording Agreement, the Band would record the Album, and Ms. Fancher would collect and disburse monies derived from the exploitation of the Album. *Joint Pretrial Stipulation*, Section A, ¶ 3 [doc. 155].

The Recording Agreement states, in relevant part:

> You hereby grant to [Ms. Fancher], for the term of this agreement, your exclusive services as a performing artist for the purpose of making phonograph record master recordings….

> The initial term of this agreement will be six months from the date hereof and [Ms. Fancher] shall have one option to extend the term hereof six months. [Ms. Fancher] agree[s] to record one album of your performance during the initial term this agreement is effect [*sic*]. …

> [Ms. Fancher] agree[s] to account for and pay you royalties upon all the terms and conditions set forth in the annexed schedule entitled "Computation of Royalties". The royalty rate applicable to each master shall be twenty (20) percent of the wholesale price for records sold in disc form. Four (4) percent shall be received by each band member who plays on the master recording and four (4) percent shall be received by Glen E. Friedman for his services.

> * * *

> You agree that all musical compostions [*sic*] which are recorded hereunder and which are written in whole or in part by you or which are owned or controlled in whole or in part by you, directly or indirectly ("Controlled Composition") shall be published by [Ms. Fancher] or [her] designated affiliate.

*Recording Agreement*, p. 1 [Ex. 6].

The Terms and Conditions schedule attached to the Recording Agreement states, in relevant part:

> RIGHTS GRANTED. Artist grants to [Ms. Fancher] … **the exclusive, perpetual, unencumbered and worldwide title, in and to all results and proceeds of Artist's services and performances hereunder, any and all master phonograph records, sound recordings … which include the voice, instrumental or other sound effects, … services or performances of Artist** ….

> \* \* \*

> MECHANCIAL LICENSES. Any and all [Controlled Compositions] shall be and hereby are licensed to [Ms. Fancher] or [Ms. Fancher]'s licensees at the statutory rate, or that rate established by the Copyright Royalty Tribunal, in effect on the date the recording hereof is initially released hereunder, but at not more than seven times such rate with respect to single disc, twelve-inch long-playing albums or equivalent configurations. Such royalties shall be payable only in respect of net sales for which royalties are payable pursuant to the annexed Computation of Royalties schedule.

> \* \* \*

> MISCELLANEOUS. … Artist agrees to indemnity [*sic*] [Ms. Fancher] and its licensees and hold them harmless from any and all loss, damage, or liability, including reasonable attorneys fees, resulting from any claimed breach by Artist of this agreement or of any of the representations or warranties of Artist contained herein.

> \* \* \*

> The term "records" or "phonograph records" shall include all forms of recordings (both visual and non-visual) including, without limitation, discs of any speed or size, pre-recorded tapes, cartridges and any other recorded devices **now known or which may hereafter become known**.

*Id.*, pp. 3, 5-7 [Ex. 6] (emphasis added).

The Computation of Royalties schedule attached to the Recording Agreement states, in relevant part:

> Royalties payable hereunder shall be computed at the applicable royalty rate on the basis of the suggested retail list price, less all taxes and union payments, in respect of 90% of [Ms. Fancher]'s sales of all phonograph records embodying Artist's performances, except as hereinafter provided. The royalty with respect to all forms of pre-recorded tape shall be computed at three-quarters of the otherwise applicable rate.

[Ms. Fancher]'s net sales of any record shall be determined on the basis of the number of copies of such record sold by [Ms. Fancher] and for which [Ms. Fancher] has been paid after all returns, rebates, credits, cancellations, exchanges, etc., and prior to final determination thereof [Ms. Fancher] may set up reasonable reserves therefore, not to exceed twenty (20%) percent of the total number of records sold in the two most recent accounting periods on a given royalty statement.

With respect to net sales (in disc and tape configurations) through normal retail channels outside of the United States via the usual distributors of [Ms. Fancher]'s licensees ..., the royalty payable will be fifty (50%) percent of the otherwise applicable royalty were such records sold in the United States, or fifty (50%) of the amount actually received or credited to [Ms. Fancher] by such licensee, whichever shall be less. ...

With respect to royalties earned through sales by any licensee within the United States, the royalty payable will be fifty (50%) percent of the net amount actually received by or credited to [Ms. Fancher] by such licensee, and will be payable in the next accounting period after such payment has been so received or credited.

* * *

No royalties shall be payable to you on sales by any of [Ms. Fancher's] licensees until payment on such sales has been received by [Ms. Fancher]. In the event such licensees have made advances or guarantees to [Ms. Fancher] in anticipation of such sales, payment shall not be deemed to have been received by [Ms. Fancher] for purposes of this paragraph until such sales have been credited by [Ms. Fancher's] licensees against such advances or guarantees.

* * *

Within 90 days after March 31 and September 30 of each year during which applicable phonograph records are sold, [Ms. Fancher] will render a statement of accrued royalties earned under the Agreement during the preceding calendar half-year, less all amounts chargeable thereagainst (including, to the extent lawful or as permitted hereunder, all or any portion of any indebtedness then owing by Artist to [Ms. Fancher]) under the Agreement. Simultaneously with the rendering of its statement, [Ms. Fancher] will pay Artist the net amount, if any, shown to be due thereon, less any deductions .... Artist shall be deemed to have consented to each statement, and such statement shall become final and binding upon Artist one year after the rendition thereof unless Artist renders specific written objection thereto within such period; and if [Ms. Fancher] gives Artist written notice that it denies the validity of the objection, unless suit is instituted within 6 months of the date [Ms. Fancher] gives such notice.

*Id.*, pp. 8, 10.

### D.    The Agreements re: Composition Copyrights to the Album

#### 1.    The Frontier Co-Publishing Agreement

On September 9, 1983, Mr. Muir, on behalf of the Band, entered into a "Co-Publishing Agreement" with Ms. Fancher (the "Frontier Co-Publishing Agreement") concerning the composition copyrights to the Album [Ex. 38]. The Frontier Co-Publishing Agreement states, in relevant part:

> [Ms. Fancher] and [the Band] agree to co-publish together a music composition entitled: FLP 1011 in entirety [i.e., the Album], words and/or music written by: [the Band].

> [Ms. Fancher] and [the Band] agree to co-publish the composition on a fifty-fifty (50-50) basis: [Ms. Fancher] to receive fifty (50%) per cent, and [the Band] to receive fifty (50%) per cent of any and all of the publishing receipts of said composition, subsequent to payment of all writer royalties; costs of copyright and usage registration; printing and any and all miscellaneous, normal expenses incurred in [*sic*] the behalf of said composition.

> * * *

> [The Band] agrees that [Ms. Fancher] shall issue all licenses for the mechanical reproduction and synchronization uses of said compositions throughout the world, and for sub-publication rights to said composition throughout the world in [*sic*] behalf of both parties.

> It is further agreed that [Ms. Fancher] shall be held accountable to [the Band] and the composer(s), and [Ms. Fancher] agrees to make statements and payments to [the Band] within forty-five (45) days after June 30th and December 31st of each calendar year.

*Frontier Co-Publishing Agreement* [Ex. 38].

#### 2.    The Bug Music Co-Publishing Agreement

Bug Music, Inc. ("Bug Music") was a music publishing company. *Declaration of David Hirshland* ("Hirshland Decl."), ¶ 11 [doc. 164]. On March 26, 1997, Ms. Fancher and Bug Music entered into a "Co-Publishing Agreement" (the "Bug Music Co-Publishing Agreement") concerning the composition copyrights to the Album [Ex. 7]. Pursuant to the Bug Music Co-Publishing Agreement, Bug Music obtained joint ownership of Ms. Fancher's 50% interest in the composition copyrights to, among other songs in Ms. Fancher's catalog, the Mayorga Songs.

Additionally, Bug Music would serve as the exclusive administrator of the Mayorga Songs. *Declaration of David Hirshland* ("Hirshland Decl."), ¶¶ 9, 11 [doc. 164]. As administrator, Bug Music would collect money for the exploitation of the composition copyrights and then distribute the money to writers and publishers, less a fee for administration services. *Id.*, ¶ 10. Bug Music would send to writers and publishers a quarterly statement of account. *Id.* The statements of account set forth all activity related to the exploitation of the songs and the royalties earned, if any. *Id.*, ¶¶ 10, 12. If royalties were payable, the statement of account would be accompanied by a payment. *Id.*, ¶¶ 10, 13.

In 2011, BMG Rights Management (US) LLC ("BMG") acquired Bug Music and started administering the composition copyrights to the Mayorga Songs under the Bug Music Co-Publishing Agreement. *Hirshland Decl.*, ¶ 11. "When digital downloads and digital streaming arose, BMG accounted for royalties for songs that were downloaded or streamed. Each accounting statement would show line items for digitally downloaded or streamed songs." *Id.*, ¶ 13. As early as late 2011, statements issued to Mr. Mayorga by BMG would have reflected digital downloads and digital streaming activity. *Id.*, ¶ 17.

Bug Music and BMG paid Mr. Mayorga for his shares of composition royalites from the Mayorga Songs and sent quarterly statements "consistently without interruption" since before 2005. *Id.*, ¶ 14. "Statements were sent by mail until recently and now they are delivered via secure digital link." *Id.*, ¶ 16.

### E.    Ms. Fancher's Problems with Distributors

Before May 2009, Ms. Fancher's distributor was Lumberjack Mordam. Lumberjack Mordam maintained commercial relationships with retailers, managing the sale and delivery of Ms. Fancher's physical media to retailers. *Trial Tr. for Mar. 24, 2025*, p. 130. In May 2009, Lumberjack Mordam ceased operations. *Fancher Decl.*, ¶ 11. When it closed, Lumberjack Mordam stopped sending statements to Ms. Fancher. *Trial Tr. for Mar. 24, 2025*, p. 130. Ms. Fancher estimates that Lumberjack Mordam owed her $25,000 to $30,000 in revenue from sales. *Id.*, pp. 129-130.

On July 15, 2009, Ms. Fancher emailed Mr. Mayorga and Mr. Estes, stating:

I'm sure you're looking for royalty checks. The bad news is my distributor just went bankrupt, I got stiffed for all the money I'm owed from spring and I don't start getting paid by the new place until September.

[Ex. 8]. Regarding this email, Mr. Mayorga testified that he "had no reason to believe [Ms. Fancher] was lying" to him. *Mayorga Decl.*, ¶ 9.

Following Lumberjack Mordam's closure, Ms. Fancher transitioned to using Independent Label Collective ("ILC") as her distributor. *Id.*, ¶ 12. In August 2011, ILC ceased operations. *Fancher Decl.*, ¶ 13. Ms. Fancher represents that when ILC shut down, it "did not pay for almost all of the sales of physical product or digital streaming…." *Id.*

In August 2011, Ms. Fancher and Mike Kashian co-founded a new distribution company, called Independent Label Distribution ("ILD"). *Id.*, ¶ 14. Ms. Fancher maintains a 50% ownership interest in ILD. In 2012, Ms. Fancher was "co-running" ILD. *Trial Tr. for Mar. 24, 2025*, pp. 40, 117.

ILD charged a fee in the amount of 10% of all sound recording revenues earned from exploitation of the Album—physical and digital. ILD handled distribution of the Album via physical media; for digital distribution of the Album, ILD contracted with The Orchard. For its part, The Orchard charged a fee in the amount of 10% of the sound recording revenues earned from digital exploitation of the Album. Ms. Fancher testified that ILD contracted with The Orchard because The Orchard would not do a direct licensing agreement with a record label; it would contract only with distributors.

**F.      *Ms. Fancher's Accounting and Payment of Recording Royalties***

At issue is Ms. Fancher's accounting and payment of recording royalties to Mr. Mayorga between 2009 and 2022. *See Joint Pretrial Stipulation*, Section A, ¶ 4 [doc. 155]; *Order Denying Defendant's Motion to Bifurcate Trial* [doc. 74]. Between January 2009 and March 2021, Ms. Fancher did not issue to Mr. Mayorga any statements of account regarding recording royalties owed to him. *Trial Tr. for Mar. 24, 2025*, p. 36. During that period, Ms. Fancher used Excel spreadsheets to calculate royalties she owed. She did not maintain a general ledger for her businesses.

2011 is when "digital streaming really began in earnest." *Fancher Decl.*, ¶ 18. With the rise of digital streaming via platforms like Spotify and Pandora, the sources of revenue from royalties have changed. Mr. Hirshland, BMG's former vice president, testified that outside of live performances, digital streaming has become the largest source of revenue for music.[3]

Ms. Fancher testified that she "was not prepared for the overwhelming accounting for digital streaming." *Fancher Decl.*, ¶ 18. Each month, ILD would send Ms. Fancher "a multi-hundred-page statement" in the form of an Excel spreadsheet containing "thousands of lines of activity" for digital streaming. *Id*. Ms. Fancher testified that although she co-owns ILD and performs some tasks for ILD, she did not prepare the statements from ILD or have access to ILD's records. According to Ms. Fancher, she did not pay attention to the statements from ILD because she was "busy." *Fancher Decl.*, ¶ 19. Ms. Fancher represented that she was preoccupied with prepping for sale the house of her father, who passed away in September 2011. *Id*., ¶¶ 8, 19. Ms. Fancher stated that she has kept these royalty records.

Ms. Fancher contends that, pursuant to the Recording Agreement, she was not obligated to account to Mr. Mayorga for digital streaming royalties. *Id*., ¶¶ 21, 26. According to Ms. Fancher, even if she did have to account for those royalties, she "would not have been capable of doing the accounting … and then creating statements…." *Id*., ¶ 21. To her, accounting for digital streaming royalties "would have killed [her] business" because "processing the small amounts of payments would have wound up costing more than the monies earned." *Id*.

### G.    Ms. Fancher Makes Sporadic Recording Royalties Payments to Mr. Mayorga

Between September 2013 and July 2016, Ms. Fancher made six payments to Mr. Mayorga totaling $7,350. *Joint Pretrial Stipulation*, Section A, ¶ 5 [doc. 155]. The payments were as follows:

---

[3] According to the Recording Industry Association of America (RIAA), a trade group that represents the interests of the U.S. recording industry at-large, "2015 was a milestone year for streaming music. For the first time, streaming was the largest component of industry revenues, comprising 34.3% of the market." Joshua P. Friedlander, *News and Notes on 2015 RIAA Shipment and Revenue Statistics*, RIAA (Mar. 22, 2016), https://www.riaa.com/riaa-2015-year-end-sales-shipments-data-report/.

| Check Date | Deposit Date | Amount | For Line |
|---|---|---|---|
| 9/5/2013 | 9/18/2013 | $350.00 | ST ADV |
| 3/11/2015 | 5/15/2015 | $3,000.00 | ON ACCT – ST ROYS |
| 8/1/2015 | 8/5/2015 | $500.00 | ST – ON ACCT |
| 11/24/2015 | 12/23/2015 | $1,000.00 | ON ACCT – ST |
| 3/30/2016 | 5/25/2016 | $1,500.00 | SUICIDAL T ROYS ON ACCT |
| 7/13/2016 | 7/18/2016 | $1,000.00 | ST – ON ACCT |

Exs. 16-21, 54.

During this time, Ms. Fancher would pay Mr. Mayorga only when he contacted her saying he needed money. Mr. Mayorga testified that he "had many conversations with her about royalties—sometimes over the phone, sometimes in person." *Mayorga Reply Decl.*, ¶ 8. Ms. Fancher stated she "was careful not to overpay" Ms. Fancher. *Fancher Decl.*, ¶ 28. She "knew [she] owed [Mr. Mayorga] some money," *id.*, ¶ 31; however, she testified that her practice of making payments was a "squeaky wheel gets the grease kind of thing." *Trial Tr. for Mar. 24, 2025*, p. 157. Regarding their conversations about royalties, Mr. Mayorga testified, "[Ms. Fancher] always had a way of making me believe she had things under control and I was getting what I should have been getting. Looking back, I see that was part of how she kept me in the dark." *Mayorga Reply Decl.*, ¶ 9.

Ms. Fancher "didn't know the exact amount of royalties due" to Mr. Mayorga and characterized her calculations as "guesstimates." *Fancher Decl.*, ¶ 28; *Trial Tr. for Mar. 24, 2025*, p. 38. Nevertheless, Ms. Fancher contends that she "had some idea of the state of [Mr. Mayorga's] account;" she "had a general idea of what [the Band] earned in royalties in an average year" because "the [A]lbum was a consistent seller," and knew whether, at the times Mr. Mayorga requested payments, "sales were higher [or lower] than the average year." *Id.*, ¶ 28.

None of Ms. Fancher's calculations for the above payments to Mr. Mayorga included digital streaming royalties. *Fancher Decl.*, ¶ 37. Around the mid-2010s, Mr. Mayorga realized he might be owed digital streaming royalties from Ms. Fancher. *Mayorga Decl.*, ¶ 10.

### 1.    The May 2015 Check

On May 11, 2015, Mr. Mayorga emailed Ms. Fancher, stating:

Hi Lisa , louichi here ,, in a bind and really need to start asking for my money ,,,

been talking to Neville Johnson ,but wanted to try a "softer approach" to avoid "legal fees" ... If I don't hear back from you a couple of days ,then I have proceed w "legal action".... L

[Ex. 11]. A few minutes later, Ms. Fancher replied, stating, "I will send you some loot, no need to spend money on lawyers when you don't have funds already." *Id*. Mr. Mayorga wrote back:

Thnx Lusa don't mean to bust ur balls but I'm gonna loose my car ,all my [stuff] in the pawn shop, not to mention my rent , so please understand 300.00 bux will not cut it , not even close ... I hope u understand Lisa and please let me know what's up

*Id*. On May 13, 2015, Ms. Fancher mailed to Mr. Mayorga a check in the amount of $3,000. *Id*. The check was dated May 11, 2015 [Ex. 17]. Mr. Mayorga received and deposited the check on May 15, 2015. *Id*.

### 2.   *The August 2015 Check*

On July 31, 2025, Ms. Fancher emailed Mr. Mayorga, stating, "I got your message. I am super broke myself as it's the dead of summer & no one buys records. I can send $500." [Ex. 11]. Mr. Mayorga asked for $1,000 instead. Ms. Fancher replied, stating, "I can't this month, had to pay my pressing plant COD. Trying to hit all the squeaky wheels! Hit me up around the 15th & I'll see how bad my new check amt is... :/" Ms. Fancher's reply indicated that she mailed to Mr. Mayorga a check in the amount of $500 on August 1, 2015 [Ex. 11]. Ms. Fancher testified that her intention in sending this email "was to delay [Mr. Mayorga] slightly." *Trial Tr. for Mar. 24, 2025*, p. 147. On August 4, 2015, Mr. Mayorga received and deposited the check sent on August 1, 2015. [Exs. 11, 18].

### 3.   *The December 2015 Check*

On December 7, 2015, Mr. Mayorga emailed Ms. Fancher, stating:

Hi Lisa was really hopin to get a reply from you it's the end of the year and Hollidays are here and I just needed a lil help ,, hope to hear or get a lil something before Xmas I have kids and it's a lil tough.

[Ex. 11]. Ms. Fancher replied that she had mailed to Mr. Mayorga a check in the amount of $1,000 a couple weeks prior. The next day, after confirming that Mr. Mayorga never received the check, Ms. Fancher wrote to Mr. Mayorga, "My employee just found it under the seat of her car, it fell out of the mail tub!" The check was dated November 24, 2015 [Ex. 19]. At this point, Mr.

Mayorga started to think the circumstances concerning Ms. Fancher's payments were suspicious, and he retained an attorney to investigate. *Mayorga Decl.*, ¶ 16.

### 4.     The March 2016 Check

On March 4, 2016, Mr. Mayorga emailed Ms. Fancher stating that he was behind on child support and requested $3,000 [Ex. 14]. Ms. Fancher replied, "I'm broke too at the moment as I had record store day mfg bills, next check doesn't drop til next week." On March 30, 2016, Ms. Fancher indicated she mailed to Mr. Mayorga a check in the amount of $1,500 that day. On May 18, 2016, Mr. Mayorga sent Ms. Fancher a follow up email regarding the status of the check. On May 25, 2016, Mr. Mayorga deposited the check, which was dated March 30, 2016 [Ex. 20].

On June 3, 2016, Mr. Mayorga emailed Ms. Fancher. His email stated that he would not "wait another 20 somethin years" for her to pay the royalties she owed him. Ms. Fancher replied:

> I've been sending money when I can. I got nothing this month, I'm not a bank. You are very close to getting caught up & it hasn't been 20 years since you got a stmt.
>
> Considering you're actively trying to take the record away, there's not a lot of incentive to put you first in line. Sales are very bad, people aren't buying anything right now.
>
> Hopefully next month will be better...

[Ex. 14]. At this point, Ms. Fancher was aware that Mr. Mayorga was working with an attorney, Evan Cohen, to investigate her payments. She viewed Mr. Mayorga's retention of Mr. Cohen as efforts to "actively try to take the [Album] away."

### 5.     The July 2016 Check

On July 6, 2016, Mr. Mayorga emailed Ms. Fancher requesting another check [Ex. 34]. The next day, Ms. Fancher responded, "I'll get you something!" On July 18, 2016, Mr. Mayorga deposited a check from Ms. Fancher in the amount of $1,000, which was dated July 13, 2016 [Ex. 21].

### H.     Ms. Fancher's Practices re: Paying Her Debts

While Ms. Fancher was collecting royalties due to Mr. Mayorga, she paid creditors in descending order of priority as follows: (1) the mortgage for her residence; (2) Ms. Fancher's

part-time employee and the pressing plant that manufactures physical media for sale by Ms.
Fancher; (3) legal fees and credit card payments; and (4) all others based on the concept that "the
squeaky wheel gets the grease."

Ms. Fancher's first priority was making payments on the mortgage for her residence; she
testified, "I work at home. It's kind of hard not to pay for my office or [Mr. Mayorga] wouldn't
be getting any money whatsoever." *Trial Tr. for Mar. 24, 2025*, p. 140. Ms. Fancher never missed
a mortgage payment by more than 30 days. *Id.*, pp. 24-26.

Ms. Fancher paid her part-time employee second "for her loyalty to [Ms. Fancher]." *Id.*,
pp. 151, 156. As for the pressing plant, Ms. Fancher testified, "if I can't pay the pressing plant,
then everything comes to a halt." *Id.*, p. 146. Occasionally, Ms. Fancher would use her credit
cards to pay the pressing plant and other business expenses. *Id.*, p. 158.

Mr. Mayorga fell into the last category of other creditors. According to Ms. Fancher, in
mid-2015, she was not paying royalties owed to any artist on her record label aside from Mr.
Mayorga. *Id.*, p. 149.

### I.        The Royalties Action

The investigation by Mr. Mayorga's attorney revealed to him that Ms. Fancher
"miscalculated the correct amount of royalties for sales of physical phonorecords and sales of
permanent digital downloads," and that she was "actively concealing" and "simply kept … for
herself" all the money that she "received from digital streaming." *First Amended Complaint in
Royalties Action*, ¶ 22 [Ex. 1]. On December 8, 2016, Mr. Mayorga filed a complaint against Ms.
Fancher and others in the Superior Court of California, County of Los Angeles (the "State
Court") for: (1) breach of the Recording Agreement; (2) breach of the Frontier and Bug Music
Co-Publishing Agreements; (3) accounting; and (4) fraud and concealment (the "Royalties
Action"). *Joint Pretrial Stipulation*, Section A, ¶ 6 [doc. 155]. Mr. Ackerman and A. Eric
Bjorgum represented Ms. Fancher in the Royalties Action. *Declaration of A. Eric Bjorgum*
("Bjorgum Decl."), ¶¶ 2, 4-5 [doc. 170].

After Mr. Mayorga initiated the Royalties Action, Ms. Fancher stopped making any payments to him. *Trial Tr. for Mar. 24, 2025*, pp. 200-01. Ms. Fancher testified that she continued making payments to other members of the Band for royalties she owed.

### 1.    The Settlements

On August 30, 2017, Mr. Mayorga and Ms. Fancher signed a "Stipulation re Settlement" [Ex. 71]. The document provided that if the parties did not "reach an agreement regarding transfer, assignment and waiver" of certain things, and if payment of a sum uncertain to Ms. Fancher was not made by September 6, 2017, the document would be "void and of no effect as though it never existed." *Stipulation re Settlement*, ¶ 8 [Ex. 71]. The payment never occurred, and the State Court later determined that the Stipulation re Settlement was a nullity. *See Court's Ruling at Hearing Held on 2/13/25* [doc. 150].

According to Ms. Fancher, the agreement was that Mr. Mayorga's former counsel, Mr. Cohen, would pay $75,000 to Ms. Fancher in exchange for Ms. Fancher transferring the sound recording copyrights to Mr. Cohen. *Trial Tr. for Mar. 24, 2025*, p. 50. Mr. Mayorga later sued Mr. Cohen for malpractice concerning Mr. Cohen's financial conflict of interest in the Royalties Action, which Mr. Mayorga settled in exchange for a lump sum payment of $515,000 from Mr. Cohen's malpractice insurer. Mr. Mayorga testified that he personally received $275,000 of that settlement amount.[4]

On May 9, 2017, Mr. Mayorga filed an amended complaint in the Royalties Action, naming BMG as a defendant. *Hirshland Decl.*, ¶ 4. In September 2017, BMG settled with Mr. Mayorga regarding the Royalties Action. *Hirshland Decl.*, ¶ 5. As part of the settlement, BMG sold the composition copyrights in the Mayorga Songs to Mr. Mayorga for $15,000. Pursuant to an indemnification provision in the Bug Music Co-Publishing Agreement, BMG withheld $90,000 in royalties otherwise payable to Ms. Fancher on account of BMG's legal fees and costs incurred in the Royalties Action.

---

[4] After suing Mr. Cohen for malpractice, Mr. Mayorga substituted Mr. Cohen for Mr. Martorell, his current counsel.

**2.**     *The Preliminary Injunction and 2019 Audit Letter*

In August 2019, Mr. Mayorga requested that Ms. Fancher allow him to conduct an audit of Ms. Fancher related to the Band's royalty documents. Ms. Fancher denied Mr. Mayorga's request. Mr. Mayorga then filed a motion for a preliminary injunction. *Martorell Decl.*, ¶ 8. On August 13, 2019, the State Court issued a ruling [Ex. 3][5] granting Mr. Mayorga's motion, allowing Mr. Mayorga to conduct an audit of Ms. Fancher related to the Band's royalty documents pursuant to Cal. Civ. Code § 2501 (the "Preliminary Injunction"). *Joint Pretrial Stipulation*, Section A, ¶ 8 [doc. 155].

On September 16, 2019, Mr. Mayorga's forensic accountant, Cedar Boschan, sent a letter to Ms. Fancher in which she requested certain of Ms. Fancher's records necessary to perform the audit (the "2019 Audit Letter"). *Declaration of Cedar Boschan in Support of Accounting Pursuant to Court's Statement of Decision and in Accordance with November 10, 2021 Status Conference re: Progress of Accounting* ("Boschan Nov. 2021 Decl."), Ex. 1 thereto [Ex. 22]. The 2019 Audit Letter included Ms. Boschan's standard questionnaire and requested certain of Ms. Fancher's financial books and records. *Declaration of Cedar Boschan in Support of Plaintiff's Order to Show Cause* ("Boschan Feb. 2021 Decl."), ¶ 29 [Ex. 90].

On September 10, 2019, Ms. Fancher filed an appeal of the Preliminary Injunction. *Trial Tr. for Mar. 27, 2025*, p. 10. After the court of appeals dismissed the appeal, Ms. Fancher filed a motion to vacate the dismissal. *Id.*, pp. 10-11. After several extensions of the deadline to file opening briefs, on January 26, 2021, the court of appeals dismissed the appeal at Ms. Fancher's request. *Id.*, pp. 12-13.

At a hearing on July 2, 2020, the State Court ordered the parties to meet and confer about the audit. *Trial Tr. for Mar. 27, 2025*, pp. 20-21. On July 28, 2020, Ms. Fancher's counsel sent a letter to Mr. Mayorga's counsel in which Ms. Fancher offered to permit a limited audit of "physical sales records, digital download records and synchronization licensing records for three years going backward from the date of the audit request." *Declaration of Michael B. Ackerman in Support of Defendant's Opposition to Plaintiff's Motion in Limine "B"*, ¶ 10 and Exhibit A

---

[5] *See also* supplement to Ex. 3 admitted at trial.

thereto [doc. 142-1]. Ms. Fancher excluded digital streaming records from the offered audit. *Id*.

On August 4, 2020, Mr. Mayorga's counsel sent a reply letter in which Mr. Mayorga objected to

the limited scope of Ms. Fancher's offered audit. *Id*., ¶ 11 and Exhibit B thereto.

### 3.    *The Laptop Audit Offer*

On January 26, 2021—during the height of the COVID-19 pandemic—Mr. Bjorgum

offered Mr. Mayorga's counsel an opportunity to audit Ms. Fancher's records, with an important

caveat: the documents would be available for inspection on a laptop in a conference room at Mr.

Bjorgum's office in Pasadena, California [Ex. 60]. Moreover, the documents were significantly

less than what was requested in the 2019 Audit Letter; Ms. Fancher was offering:

1) statements in Excel spreadsheet form from ILD, Frontier's distributor, to Frontier
   showing physical sales from September 2015 … until December 31, 2020;

2) statements in Excel spreadsheet form from ILD, showing digital streaming and
   digital download activity from September 2015 … until December 31, 2020; and

3) Frontier's documents related to synchronization license activity from September
   2015 until December 31, 2020.

[Ex. 60]. The "vast majority of" the lines in the Excel documents would be redacted by Ms.

Fancher to prevent disclosure of information that purportedly did "not apply to [the Band]." *Id*.

Mr. Mayorga refused this offer as unreasonable.

According to Ms. Boschan, who has 20 years of royalty accounting experience and has

"testified as an expert forensic accountant and royalty auditor witness over a dozen times," the

documentation and procedures offered by Ms. Fancher "would be improper and a waste of

valuable time and resources. Without the underlying data and native files that support the offered

documentation, there is no way to reasonably and efficiently determine the authenticity and

accuracy of the offered documentation or focus the procedures to disclose findings in a

meaningful way." *Boschan Feb. 2021 Decl*., ¶¶ 1, 4 [Ex. 90].

When asked why Mr. Bjorgum was not willing to email the documents to Mr. Mayorga,

Mr. Bjorgum testified, "that's just how it's done. It's how it's always been done for me." *Trial Tr.*

*for Mar. 27, 2025*, p. 191. When asked how many times he has had people come to his office for

an audit to look at his computer, Mr. Bjorgum answered "just this time." *Id*. Mr. Bjorgum's other

reason for offering the documents in-person only was to prevent the information from being

given to Mr. Mayorga's lawyer, who Mr. Bjorgum thought could use the information to turn

other artists in Ms. Fancher's catalog into potential clients. *Id*., p. 196. Ms. Fancher did not

attempt to execute a non-disclosure agreement with Mr. Mayorga's lawyer or seek a confidential

protective order from the State Court to ameliorate that concern. *Id*.

### 4.    *The Bench Trial and Statement of Decision*

In March 2021, the State Court held the first phase of a bench trial pursuant to the parties'

stipulation. Phase one concerned Ms. Fancher's contention that Mr. Mayorga was not entitled to

receive digital streaming royalties under the Recording Agreement. Phase two was intended to

concern the amount of Mr. Mayorga's damages.

On May 20, 2021, the State Court issued an oral ruling in which it found that Mr.

Mayorga "had a right under the Recording Agreement to digital streaming royalties and that [Ms.

Fancher] breached the Recording Agreement by failing to pay [Mr. Mayorga] his digital

streaming royalties." *Joint Pretrial Stipulation*, Section A, ¶ 9 [doc. 155]. On August 12, 2021,

the State Court entered a "Statement of Decision" [Ex. 2]. The Statement of Decision explains, in

relevant part:

> The testimony from both experts and [Ms. Fancher] herself was undisputed that in
> the age of streaming, these rights now account for 80% to 85% of revenue generated
> from recorded music. There was also agreement that to this point in time, [Ms.
> Fancher] has retained 100% of this money for herself. It is a breach of the
> [Recording Agreement] as well as a violation of the covenant of good faith and fair
> dealing, a principle of law applied to all contracts, for [Ms. Fancher] to retain all
> this income while the artist ([Mr. Mayorga]) is deprived of his contractual share of
> this valuable revenue stream.
>
> * * *
>
> [Mr. Mayorga] is entitled to royalty payments under the [Recording] Agreement for
> the exploitation of the sound recordings that he made. It would be unreasonable to
> conclude that [Mr. Mayorga] is not to be paid for new forms of exploiting the sound
> recordings that did not exist when the Parties entered into the [Recording]
> Agreement.
>
> * * *

The [State] Court has been advised that [Ms. Fancher], during the [Royalties Action], has prepared Excel spreadsheets from September 2015 through the end of 2020 regarding digital streaming royalties. These spreadsheets, and all the native files upon which they rely, as well as all other native files concerning digital streaming rights from December 2012 to the present and continuing, shall be turned over through some electronic method to [Mr. Mayorga]'s designated forensic accountant within 21 days of the entry of the [Statement of Decision]. This ruling is made independent of the OSC re: contempt for violating the terms of the preliminary injunction order which remains pending at the request of [Mr. Mayorga].

*Statement of Decision* [Ex. 2].

### 5.    *Ms. Fancher Resumes Payments to Mr. Mayorga*

Following the State Court's ruling, Ms. Fancher resumed payments of certain royalties to Mr. Mayorga. On March 13, 2021, Ms. Fancher issued a check in the amount of $9,787.32 [Ex. 84]. The check was accompanied by nine "Artist Royalty Statements," which indicated that the payment was for the period from 2009 to December 31, 2020, and concerned royalties on physical sales and digital downloads of the Album and individual songs on the Album. The statements account for royalties on digital downloads only after 2016.

On March 30, 2022, Ms. Fancher issued statements and a check in the amount of $4,332.34 for royalties on physical sales and digital downloads in 2021 [Ex. 86]. On November 30, 2022, Ms. Fancher issued a statement and a check in the amount of $3,036.04 for royalties on physical sales and digital downloads in January through June 2022 [Ex. 87]. None of these payments accounted for digital *streaming* royalties.

### 6.    *Ms. Boschan's Follow-Up Requests*

On August 27, 2021, Mr. Bjorgum "uploaded files of digital streaming royalty statements to a secure 'hightail' digital link online." *Bjorgum Decl.*, ¶ 22. On October 12, 2021, Ms. Boschan's office received certain records from Ms. Fancher's counsel that she understood to be in response to the 2019 Audit Letter. *Trial Witness Declaration of Plaintiff's Expert Cedar Boschan* ("Boschan Feb. 2025 Decl."), ¶ 21 [doc. 157].

After reviewing those records, on October 22, 2021, Ms. Boschan's office requested a few additional documents. *Boschan Nov. 2021 Decl.*, ¶ 5 and Ex. 2 thereto [Ex. 22]. Specifically, Ms. Boschan's office requested: (1) proof of payments from 2017 to 2021 for any payments that

Ms. Fancher wanted to be credited; and (2) as requested in the 2019 Audit Letter, a list of

licenses requests of the Band's masters, including whether they were licensed and the amount of

flat fee licenses. *Id*. Ms. Fancher denied each request as "patently irrelevant" and "improper." *Id*.

On October 28, 2021, Ms. Boschan's office emailed Ms. Fancher's counsel. *Id*., Ex. 3

thereto. The email asked whether Ms. Fancher would provide certain information that was

requested in the 2019 Audit Letter and requested clarification regarding two documents Ms.

Fancher produced on October 12, 2021. *Id*. On November 8, 2021, Ms. Fancher's counsel sent a

letter in which he asserted that the requests "constitute new and improper discovery well after the

discovery cut-off" in the Royalties Action. *Id*, Ex. 4 thereto.

Ms. Boschan characterized Ms. Fancher's responses as an "extreme degree of refusal to

cooperate" that "made it difficult to move the audit forward efficiently, and it materially and

unnecessarily drove up costs." *Boschan Feb. 2025 Decl.*, ¶ 34; *Boschan Nov. 2021 Decl.*, ¶ 15.

### 7.    *The Contempt Proceedings*

In January 2020, Mr. Mayorga moved for issuance of an order to show cause regarding

contempt of the Preliminary Injunction (an "OSC re Contempt"). Because the State Court closed

due to the COVID-19 pandemic, on July 2, 2020, Mr. Mayorga again moved for issuance of the

order to show cause. On May 4, 2022, after numerous continuances so that the parties could

reach an agreement, the State Court issued an OSC re Contempt.

Between late 2022 and early 2023, the State Court held a contempt trial. *Joint Pretrial

Stipulation*, Section A, ¶ 11 [doc. 155]. On February 3, 2023, the State Court issued a decision

regarding Ms. Fancher's contempt [Ex. 4]. The decision provides, in relevant part:

> The [State] Court finds Defendant Lisa Fancher guilty on Count 1 – willful
> disobedience of this Court's August 13, 2019 Preliminary Injunction ordering her
> to allow [Mr. Mayorga] to conduct and audit to which he is entitled under Civil
> Code section 2501 prior to September 27, 2019 or a later date if agreed by [Mr.
> Mayorga].
>
> Contempt Hearing (Sentencing) is scheduled for 03/30/2023….

[Ex. 4]; *Joint Pretrial Stipulation*, Section A, ¶ 11 [doc. 155].

On March 8, 2023, Mr. Mayorga filed a motion for attorneys' fees related to the contempt proceedings, in which he sought $115,576.94 from Ms. Fancher. [Ex. 5]; *Joint Pretrial Stipulation*, Section A, ¶ 12 [doc. 155]. The State Court set Mr. Mayorga's motion for attorneys' fees for hearing on March 30, 2023. *Id*., ¶ 11.

### J.    The Bankruptcy Case

Two weeks before the hearing on Mr. Mayorga's motion for attorney's fees, Ms. Fancher filed her chapter 13 petition. In her statement of financial affairs, Ms. Fancher disclosed that her gross income was $375,398 in 2021, $267,639 in 2022, and $70,018.98 in the period from January 1 to March 16, 2023. *Statement of Financial Affairs*, ¶ 4 [1:23-bk-10324-VK, doc. 1].

In her schedule I, Ms. Fancher discloses that, as of the petition date, her monthly income was $12,164.61. In her schedule J, Ms. Fancher represents that, as of the petition date, her monthly net income (i.e., after expenses) was $5,532.73. In the "Business Income and Expenses" worksheet attached to her schedules I and J, Ms. Fancher represented that her gross business income was $407,213 for the twelve months prior to the petition date. *Schedules I and J*, p. 54 [1:23-bk-10324-VK, doc. 1]. At trial, Ms. Fancher estimated that 40% of her income was from the Band.

In her schedule E/F, Ms. Fancher disclosed a claim of Mr. Mayorga for "unpaid royalties" with a scheduled value of $40,000. *Schedule E/F*, ¶ 4.40 [1:23-bk-10324-VK, doc. 1]. On May 31, 2023, Ms. Fancher filed a chapter 13 plan [1:23-bk-10324-VK, doc. 21]. On August 8, 2023, the Court entered an order confirming Ms. Fancher's chapter 13 plan [1:23-bk-10324-VK, doc. 42].

### K.    The Adversary Proceeding

On July 17, 2023, Mr. Mayorga filed a complaint against Ms. Fancher (the "Complaint") [doc. 1]. The Complaint included claims for nondischargeability of the debt owed to Mr. Mayorga under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6), and denial of Ms. Fancher's discharge under 11 U.S.C. §§ 727(a)(3) and (a)(4).

On October 2, 2023, Ms. Fancher filed a motion to dismiss the Complaint (the "Motion to Dismiss") [doc. 9]. On November 9, 2023, the Court entered an order granting in part and

denying in part the Motion to Dismiss [doc. 20]. *See also Court's Ruling on Motion to Dismiss* [doc. 16]. The order dismissed without prejudice Mr. Mayorga's claims under 11 U.S.C. §§ 523(a)(6), 727(a)(3), 727(a)(4), 727(a) (6), and for fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4).

On November 30, 2023, Mr. Mayorga filed a *First Amended Complaint* (the "FAC") [doc. 24], requesting nondischargeability of the debt owed to him based on: (1) actual fraud under 11 U.S.C. § 523(a)(2)(A); (2) false representation and false pretenses under 11 U.S.C. § 523(a)(2)(A); and (3) embezzlement under 11 U.S.C. § 523(a)(4). On December 14, 2023, Ms. Fancher filed her answer to the FAC [doc. 28].

In May 2024, Ms. Fancher filed a *Motion to Bifurcate Trial* [doc. 39]. In that motion, Ms. Fancher requested that the Court bifurcate the trial in this proceeding as follows: (1) a first-phase trial on liability; and (2) in the event that the Court finds Ms. Fancher liable, a second-phase trial on damages. On July 19, 2024, the Court entered an *Order Denying Defendant's Motion to Bifurcate Trial* [doc. 74] which provides, "except for determining any compensatory damages for the period of time following December 31, 2022, and any damages based on attorneys' fees and expenses, regarding which additional evidence may be submitted after the trial, the Motion is denied."

On December 16, 2024, Ms. Boschan issued a report of her findings regarding Mr. Mayorga's damages (the "2024 Boschan Report") [Ex. 39]. In February 2025, Ms. Boschan adjusted her findings (the "2025 Boschan Schedules") [Ex. 83].

Ms. Boschan testified that, as set forth in the 2025 Boschan Report, as amended by the 2025 Boschan Schedules, she "found the actual financial losses suffered by [Mr. Mayorga] total greater than $283,899, not including $275,473 in pre[judgment] interest, [and] greater than $75,219 in [her] firm's accounting consultation costs…." *Boschan 2025 Decl.*, ¶ 68. The purported "actual financial losses" in the aggregate amount of $283,899 are comprised of the following items:

(1) underpayments of royalties during the period from September 2013 to June 2021 in the amount of $12,515, *id.*, ¶ 44;

(2) underreported earnings for digital downloads and streaming during the period from January 2011 to December 2022 in the amount of $36,187, *id.*, ¶¶ 53, 55;

(3) underreported units of physical product sales by Ms. Fancher and her licensees in the amount of $1,210, *id.*, ¶¶ 56-57;

(4) underpayments by Ms. Fancher's use of an incorrect, lower percentage for exploitations of the Album not in disc form in the amount of $16,815, *id*, ¶ 63; and

(5) estimated underpayments of royalties for periods where Ms. Fancher provided no documentation in the amount of $217,171, *id*, ¶¶ 64-65.

## II.    LEGAL STANDARDS

The plaintiff's burden of proof in a nondischargeability action under 11 U.S.C. § 523(a) is "the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).

### A.    11 U.S.C. § 523(a)(2)(A)

11 U.S.C. § 523(a)(2)(A) provides that "[a] discharge under section … 1328(b) of this title does not discharge an individual debtor from any debt … for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by … false pretenses, a false representation, or actual fraud…."

#### 1.    Actual Fraud

In *Husky International Electronics v. Ritz*, 578 U.S. 355, 136 S.Ct. 1581, 194 L.Ed.2d 655 (2016), the Supreme Court "clarified that misrepresentation is not an element of actual fraud under section 523(a)(2)(A)," and that "actual fraud may include a wider array of misconduct." *In re Phillips*, 2016 WL 7383964, at *5 (B.A.P. 9th Cir. Dec. 16, 2016) (citing *Husky*). Specifically, the Supreme Court held that "the term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, *like fraudulent conveyances*, that can be effected without a false representation." *Husky*, 578 U.S. at 359 (emphasis added).

In noting that "much confusion" exists about the interplay of different provisions of the Bankruptcy Code concerning fraudulent transfers, the Eleventh Circuit Court of Appeals defined a *Husky* claim as follows:

[S]ometimes the debtor *receives* a fraudulent transfer. That's where § 523(a)(2)

kicks in. If someone sends the bankruptcy debtor money to fraudulently avoid his debt, the party owed the money can have the debt excepted from the recipient debtor's discharge—if the creditor can show that, under state law, the recipient took on the sender's debt.

\* \* \*

"The Supreme Court has clarified that the phrase "to the extent obtained by" modifies "money," not "any debt." *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). Section 523(a)(2)(A) thus "turns on how the money was obtained." *Bartenwerfer v. Buckley*, 598 U.S. 69, 72, 143 S.Ct. 665, 214 L.Ed.2d 434 (2023). If the debtor obtained money by actual fraud, then "any debts 'traceable to' the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A)." *Husky*, 578 U.S. at 365, 136 S.Ct. 1581 (citations omitted).

\* \* \*

Taken together, … for a creditor to except a debt under § 523(a)(2)(A), the creditor must show that (a) the bankruptcy debtor obtained money, property, or services by actual fraud; and, (b) the debt to be excepted resulted from the debtor's fraudulent receipt. Further, § 523(a)(2)(A) can only apply to the recipient of a fraudulent transfer because the transferor did not "obtain" money, property, or services, and his debt necessarily resulted from an earlier event.

*PRN Real Est. & Invs., Ltd. v. Cole*, 85 F.4th 1324, 1344, 1346-47 (11th Cir. 2023) (internal footnote omitted; emphasis in original); *see also In re Wigley*, 15 F.4th 1208, 1212 (8th Cir. 2021) ("A transferee who receives a fraudulent transfer with the requisite wrongful intent commits 'actual fraud,' and any debts traceable to the fraudulent transfer are excepted from discharge." (citing *Husky*)).

### 2.    *False Pretense and False Representation*

A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation or conduct intended to create and foster a false impression. *In re Reingold*, 2013 WL 1136546, *3 n.4 (B.A.P. 9th Cir. Mar. 19, 2013); *In re Russell*, 203 B.R. 303, 312 (Bankr. S.D. Cal. 1996). To prevail on a § 523(a)(2)(A) claim concerning a false pretense or false representation, a plaintiff must prove by a preponderance of the evidence the following five elements:

(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor;

(2) knowledge of the falsity or deceptiveness of the debtor's statement or conduct;

(3) an intent to deceive;

(4) justifiable reliance by the creditor on the debtor's statement or conduct; and

(5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*In re Weinberg*, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009) (citing *In re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000)).

### a.    *Misrepresentation, Fraudulent Omission or Deceptive Conduct*

"'It is well recognized that silence, or the concealment of a material fact, can be the basis of a false impression which creates a misrepresentation actionable under § 523(a)(2)(A).'" *In re Evans*, 181 B.R. 508, 514 (Bankr. S.D. Cal. 1995) (quoting *Minority Equity Capital Corp. v. Weinstein*, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983)); *see also In re Daquila*, 2011 WL 3300197 (B.A.P. 9th Cir. Feb. 28, 2011) ("A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and possessed an intent to deceive."); *In re Miller*, 310 B.R. 185, 196 (Bankr. C.D. Cal. 2004) ("The concealment or omission of material facts that a party has a duty to disclose can support the nondischargeability of a debt on the grounds of actual fraud.").

"Under common law, a false representation can be established by an omission when there is a duty to disclose." *In re Eashai*, 87 F.3d 1082, 1082 (9th Cir. 1996). Courts "look to the Restatement (Second) of Torts for guidance in determining what constitutes a fraudulent nondisclosure for purposes of § 523(a)(2)(A)." *In re Belice*, 461 B.R. 564, 580 n.10 (B.A.P. 9th Cir. 2011). The Restatement provides, in relevant part:

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

* * *

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so....

Restatement (Second) of Torts § 551 (Am. L. Inst. 1977). The official comments accompanying

Restatement § 551 explain the meaning of clause (c) as follows:

> One who, having made a representation which when made was true or believed to
> be so, remains silent after he has learned that it is untrue and that the person to
> whom it is made is relying upon it in a transaction with him, is morally and legally
> in the same position as if he knew that his statement was false when made.

*Id*. at cmt. h.

"[A] party to a business transaction has a duty to disclose when the other party is ignorant

of material facts which he does not have an opportunity to discover." *Apte v. Japra (In re Apte)*,

96 F.3d 1319, 1324 (9th Cir. 1996). "[T]he plaintiff must establish that the debtor concealed facts

and that the facts concealed were material. A concealed fact is material if 'a reasonable man

would attach importance to the alleged omission in determining his course of action.'" *Evans*,

181 B.R. at 515 (quoting *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975)).

### b. Knowledge of Falsity and Intent to Deceive

Representations made without an intent to perform satisfy the first three requirements of

§ 523(a)(2)(A). *In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989). A promise also can be considered

fraudulent when the promisor knew or should have known of his inability to perform. *In re*

*Barrack*, 217 B.R. 598, 606 (B.A.P. 9th Cir. 1998). "[A] statement made with reckless

indifference to the truth is sufficient to satisfy the requirement of a fraudulent representation by

the plaintiff." *Id*. (citing *In re Anastas*, 94 F.3d 1280, 1286 (9th Cir. 1996); and *In re Ettell*, 188

F.3d 1141, 1145 n.4 (B.A.P. 9th Cir. 1999)).

Because intent is difficult to prove through direct evidence, it "may be established by

circumstantial evidence, or by inferences drawn from a course of conduct. Therefore, in

determining whether the debtor had no intention to perform, a court may look to all the

surrounding facts and circumstances." *In re Barrack*, 217 B.R. 598, 607 (B.A.P. 9th Cir. 1998);

see also *In re Eashai*, 87 F.3d 1082, 1087 (9th Cir. 1996) ("[A] court may infer the existence of

the debtor's intent … if the facts and circumstances of a particular case present a picture of

deceptive conduct by the debtor."). "The scienter requirement for a fraudulent misrepresentation

is established by showing either actual knowledge of the falsity of a statement, or reckless

disregard for its truth." *In re Gertsch*, 237 B.R. 160, 167 (9th Cir. 1999) (internal quotation omitted).

### c.    *Justifiable Reliance*

As to the fourth requirement, "a creditor's reliance on a debtor's misrepresentation need be only justifiable, not reasonable, to except a debt from discharge under § 523(a)(2)(A)…." *In re Eashai*, 87 F.3d 1082, 1090 (9th Cir. 1996) (citing *Field v. Mans*, 516 U.S. 59, 75, 116 S.Ct. 437, 439, 441, 133 L.Ed.2d 351 (1995)).

In determining whether a creditor's reliance was justifiable, bankruptcy courts "must look to all of the circumstances surrounding the particular transaction, and must particularly consider the subjective effect of those circumstances upon the creditor." *In re Kirsh*, 973 F.2d 1454, 1460 (9th Cir. 1992); *see also Field v. Mans*, 516 U.S. at 71 (holding that justifiable reliance takes into account the "qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases"). A plaintiff does not have a duty to investigate. *Field v. Mans*, 516 U.S. at 70, 73-75 n.12.

The court of appeals in *Kirsh* described "justifiable" reliance as a mixture of objective and subjective standards, "which takes into account the knowledge and relationship of the parties themselves." 973 F.2d at 1458.

> The general rule is that a person may justifiably rely on a representation even if the falsity of the representation could have been ascertained upon investigation. In other words, "negligence in failing to discover an intentional misrepresentation is no defense." However, a person cannot rely on a representation if "he knows that it is false or its falsity is obvious to him." In sum, although a person ordinarily has no duty to investigate the truth of a representation, "a person cannot purport to rely on preposterous representations or close his eyes 'to avoid discovery of the truth.'"

*In re Apte*, 180 B.R. 223, 229 (B.A.P. 9th Cir. 1995) (citing *Kirsh*), *aff'd*, 96 F.3d 1319 (9th Cir. 1996).

### 3.    *Damages*

A creditor's recovery under § 523(a)(2)(A) is the loss to the creditor resulting from the debtor's fraud. *Cohen v. de la Cruz*, 523 U.S. 213, 223, 118 S. Ct. 1212, 140 L. Ed. 2d 341 (1998). In order for the exception to discharge in § 523(a)(2)(A) to apply, the debtor's fraud must

result in a loss to the creditor. *See Field v. Mans*, 516 U.S. at 61, 64 (describing § 523(a)(2)(A) as

barring discharge of debts "resulting from" or "traceable to" fraud). This may include attorney's

fees and costs if provided for by contract or nonbankruptcy law. *Cohen*, 523 U.S. at 223;

*Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443, 452-53, 127 S. Ct.

1199, 167 L. Ed. 2d 178 (2007).

### a.    Proximate Causation

Section 523(a)(2)(A) requires that the damage to the creditor be proximately caused by

the debtor's fraud. *In re Sabban*, 600 F.3d 1219, 1223 (9th Cir. 2010) (citing *Cohen v. de la Cruz*,

523 U.S. at 218 (1998)). "Further, as the Supreme Court explained in *Field,* a court may turn to

the Restatement (Second) of Torts (1976), 'the most widely accepted distillation of the common

law of torts,' for guidance on this issue." *In re Russell*, 203 B.R. 303, 313 (Bankr. S.D. Cal.

1996) (citing *Field v. Mans*, 516 U.S. 59, 70 (1995)).

Turning to the Restatement, proximate cause entails "(1) causation in fact, which requires

a defendant's misrepresentations to be a 'substantial factor in determining the course of conduct

that results in [the plaintiff's] loss,' § 546; and (2) legal causation, which requires the plaintiff's

loss to have been 'reasonably expected to result from the reliance,' § 548A." *Id.* (citing *In re

Siriani*, 967 F.2d 302, 306 (9th Cir. 1992) and *Restatement (Second) of Torts* §§ 546, 548A (Am.

L. Inst. 1976)). "In determining the presence of proximate cause, however, courts must refrain

from relying on speculation to determine whether and to what extent a creditor would have

suffered a loss absent fraud." *Id.*

### b.    Cal. Civ. Code § 1717

Cal. Civ. Code § 1717(a) provides:

In any action on a contract, where the contract specifically provides that attorney's
fees and costs, which are incurred to enforce that contract, shall be awarded either
to one of the parties or to the prevailing party, then the party who is determined to
be the party prevailing on the contract, whether he or she is the party specified in
the contract or not, shall be entitled to reasonable attorney's fees in addition to other
costs.

1  "California Civil Code § 1717 makes reciprocal an otherwise unilateral contractual

2  obligation to pay attorney's fees" and costs. *In re Penrod*, 802 F.3d 1084, 1087 (9th Cir. 2015)

3  (citing *Santisas v. Goodin*, 17 Cal. 4th 599, 951 P.2d 399, 406 (1998)). "California courts

4  liberally construe 'on a contract' to extend to any action '[a]s long as an action 'involves' a

5  contract and one of the parties would be entitled to recover attorney fees under the contract if

6  that party prevails in its lawsuit….'" *In re Baroff,* 105 F.3d 439, 442-43 (9th Cir. 1997) (citing

7  *Milman v. Shukhat,* 22 Cal. App. 4th 538, 545, 27 Cal. Rptr. 2d 526 (1994)).

8      When all three elements of California Civil Code § 1717 are satisfied, the statute applies

9  to issues litigated under bankruptcy law. *Id*. at 1088-89. In *Penrod*, the Ninth Circuit Court of

10  Appeals described the three elements of California Civil Code § 1717 as follows:

11      First, the action in which the fees are incurred must be an action "on a contract," a
12      phrase that is liberally construed. *In re Tobacco Cases I,* 193 Cal. App. 4th 1591,
        124 Cal. Rptr. 3d 352, 359 (2011). Second, the contract must contain a provision
13      stating that attorney's fees incurred to enforce the contract shall be awarded either
        to one of the parties or to the prevailing party. And third, the party seeking fees must
14      be the party who "prevail[ed] on the contract," meaning … "the party who
15      recovered a greater relief in the action on the contract." Cal. Civ. Code § 1717(b)(1).

16  *Id*. at 1087-88. *See also In re De Guzman*, 2025 WL 1640280 (Bankr. E.D. Cal. June 9, 2025)

17  (finding Cal. Civ. Code § 1717 applicable to creditor who prevailed in nondischargeability action

18  under § 523(a)(2)(A) that could "only be assessed by referring to" contract between debtor and

19  creditor).

20          ### c.      *Prejudgment Interest*

21      "'[T]he award of prejudgment interest in a case under federal law is a matter left to the

22  sound discretion of the trial court. Awards of prejudgment interest are governed by

23  considerations of fairness and are awarded when it is necessary to make the wronged party

24  whole.'" *In re Acequia, Inc.*, 34 F.3d 800, 818 (9th Cir. 1994) (quoting *Purcell v. United States*, 1

25  F.3d 932, 942-43 (9th Cir. 1993)). "An award of prejudgment interest in a § 523 proceeding in

26  which the creditor prevails ensures the creditor is made whole and has a full recovery." *Del Valle*,

27  577 B.R. at 810–11 (citing *Cohen*, 523 U.S. at 222–23).

28

"It is settled that where a debt that is found to be nondischargeable arose under state law, 'the award of prejudgment interest on that debt is also governed by state law.'" *In re Weinberg*, 410 B.R. 19, 37 (B.A.P. 9th Cir. 2009) (quoting *In re Niles*, 106 F.3d 1456, 1463 (9th Cir. 1997)). In turn, Cal. Civ. Code § 3288 provides that, "[i]n an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." Under Cal. Civ. Code § 3287(a), "prejudgment interest runs from the date when the damages are of a nature to be certain or capable of being made certain by calculation and when the exact sum due to the plaintiff is made known to the defendant." *Levy-Zentner Co. v. S. Pac. Transportation Co.*, 74 Cal. App. 3d 762, 798, 142 Cal. Rptr. 1, 25 (Ct. App. 1977).

"The federal prejudgment interest rate applies to actions brought under federal statute, such as bankruptcy proceedings, unless the equities of the case require a different rate." *Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 871 (9th Cir. 2001). "Under federal law the rate of prejudgment interest is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate." *United States v. Gordon*, 393 F.3d 1044, 1063 n.12 (9th Cir. 2004). In turn, 28 U.S.C. § 1961 provides that the interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."

### B.    11 U.S.C. § 523(a)(4)

11 U.S.C. § 523(a)(4) provides that a bankruptcy discharge does not discharge an individual debtor from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." For purposes of § 523(a)(4), federal law and not state law controls the definition of "embezzlement." *In re Wada*, 210 B.R. 572, 576 (B.A.P. 9th Cir. 1997).

The proponent of the nondischargeability determination must prove: (1) the proponent entrusted its property to a nonowner; (2) the nonowner appropriated the property to a use other than that for which it was entrusted; and (3) the circumstances indicate fraud. *See In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991); *In re Peltier*, 643 B.R. 349, 360 (B.A.P. 9th Cir. 2022).

1  **III.    ANALYSIS**

2      ***A.       11 U.S.C. § 523(a)(2)(A)***

3          ***1.       Actual Fraud***

4      Mr. Mayorga argues that Ms. Fancher "engaged in a sustained course of conduct that

5  meets the standard of "actual fraud'...." *Plaintiff's Closing Brief*, p. 6 [doc. 224]. However, Mr.

6  Mayorga has not proven the requisite elements to establish that Ms. Fancher committed actual

7  fraud within the meaning of § 523(a)(2)(A). Mr. Mayorga does not allege that Ms. Fancher was

8  the recipient of a fraudulent transfer with the requisite wrongful intent. Mr. Mayorga has not

9  cited any legal authority holding that actual fraud under § 523(a)(2)(A) encompasses forms of

10  fraud beyond fraudulent conveyances or similar schemes.

11          ***2.       Ms. Fancher's Misrepresentations, Knowledge of Falsity and Intent to***

12              ***Deceive***

13      Regarding this adversary proceeding, the scope of the Court's inquiry is limited to certain

14  types of royalties over a certain period of time. Mr. Mayorga's cause of action does not concern

15  composition royalties, which he receives from BMG.

16      Mr. Mayorga contends that Ms. Fancher made false representations regarding the sound

17  recording royalties she owed to him. *Plaintiff's Closing Brief*, pp. 9-15 [doc. 224]. The Court

18  finds that Ms. Fancher believed, before Mr. Mayorga initiated the Royalties Action, that she was

19  catching up on his royalties payments, other than those arising from digital streaming. As

20  concerns royalties arising from digital streaming, the Court finds that Ms. Fancher did not want

21  to pay those to the Band and concealed her receipt of those royalties.

22      As for temporal limitations, the conduct in question began in 2009, which the record

23  reflects as the first evidence of Ms. Fancher's digital streaming revenue, and ended in December

24  2016, when Mr. Mayorga stopped relying on Ms. Fancher's representations and commenced the

25  Royalties Action against her.

26      Mr. Mayorga has shown by a preponderance of the evidence that Ms. Fancher made false

27  representations, made fraudulent omissions and engaged in deceptive conduct in connection with

28  the payment of digital streaming royalties pursuant to the Recording Agreement. Ms. Fancher

knowingly concealed material facts regarding her payment of digital streaming royalties pursuant to the Recording Agreement.

When Mr. Mayorga retained an attorney to investigate whether Ms. Fancher was paying him what she owed, she misrepresented to Mr. Mayorga that he was "very close to getting caught up," although Mr. Mayorga was not receiving digital streaming royalties. It is not credible that Ms. Fancher believed she could withhold from Mr. Mayorga all royalties for digital streaming. In fact, in the Royalties Action, the State Court held that Ms. Fancher's interpretation of the Recording Agreement constituted a violation of the covenant of good faith and fair dealing.

Ms. Fancher was cognizant of the deceptiveness of her conduct. In response to Mr. Mayorga's attempts to learn what he was owed through an audit, Ms. Fancher made fraudulent omissions and engage in deceptive conduct for the entirety of the Royalties Action. Ms. Fancher placed unreasonable constraints on Mr. Mayorga's requests to inspect Ms. Fancher's records, including by refusing to provide documents despite the order of the State Court. For the records Ms. Fancher did produce, she unilaterally redacted them and, in the midst of the COVID-19 pandemic, made them available for inspection only in-person at a time when emergency stay-at-home orders were still in effect. As further indicia of her intent to deceive, after the State Court provided numerous opportunities for Ms. Fancher to comply with the audit, the State Court found Ms. Fancher guilty of willful disobedience of the Preliminary Injunction.

### 3.    *Mr. Mayorga's Justifiable Reliance*

Mr. Mayorga's reliance on Ms. Fancher's misrepresentations was justifiable. When Mr. Mayorga met Ms. Fancher and entered into the Recording Agreement, he was 19 years old. Mr. Mayorga testified that he trusted and believed Ms. Fancher when she said that she was paying him what he was owed.

Ms. Fancher contends that Mr. Mayorga's reliance was not justifiable because he "never pursued, never asked for a royalty statement, merely accepted checks for a period of years" and "ignored his BMG royalty statements" which, had he reviewed them, would have made him aware that the Album was generating digital streaming revenue. *Defendant's Closing Brief*, pp. 12-13 [doc. 225]. However, Mr. Mayorga did not have a duty to investigate, and his reliance may

1    be justifiable "even if the falsity of the representation could have been ascertained upon

2    investigation." *Field v. Mans*, 516 U.S. at 70, 73-75 n.12; *Apte*, 180 B.R. at 229.

3         Even if Mr. Mayorga did look at the BMG royalty statements, it would not have apprised

4    him of the falsity of Ms. Fancher's representations. First, the BMG royalty statements concerned

5    composition royalties owed on the Mayorga Songs. Ms. Fancher's representations concerned

6    sound recording royalties owed on the Album. Mr. Mayorga's share in the composition royalties

7    for the Mayorga Songs was greater than his share in the sound recording royalties for the Album.

8    Sound recording royalties from digital streaming of the Album conceivably could have come

9    from songs on the Album other than the Mayorga Songs. Second, Mr. Mayorga could not have

10   determined whether Ms. Fancher had paid any digital streaming royalties because Ms. Fancher

11   did not issue royalty statements to him.

12        Accordingly, the Court finds credible Mr. Mayorga's testimony that he did not know Ms.

13   Fancher's representations were false, and the falsity of Ms. Fancher's statements was not obvious

14   to him.

15     **B.**      ***11 U.S.C. § 523(a)(4)***

16        Pursuant to the Recording Agreement, Ms. Fancher owns title to the Album, including

17   Mr. Mayorga's performance of the sound recordings on the Album. Twice a year, Ms. Fancher

18   must pay to Mr. Mayorga a portion of the revenues she earns from the Album in the form of

19   recording royalties. Considering this arrangement, Mr. Mayorga cannot establish that he

20   entrusted to Ms. Fancher, as a nonowner, any of the recording royalties that became payable to

21   him. *See Littleton*, 942 F.2d at 555.

22     **C.**     ***Damages***

23       **1.**      ***Actual Damages***

24        Mr. Mayorga purportedly suffered actual damages in the amount of $36,187 for unpaid

25   sound recording royalites for digital streaming. Regarding this calculation, the 2024 Boschan

26   Report states:

27

28        [Ms. Fancher] received at least $650,402 for digital exploitations (e.g., downloads
         and streaming) of [the Band's recordings and the Album] during the period from
         January 1, 2011 through December 31, 2022.

* * *

> I compared the new documentation provided by [Ms. Fancher] with [her] accountings to Mayorga and found that … at least $65,040 should have been reported to Mayorga for the period from January 1, 2011 through December 31, 2022. However, only approximately $28,853 was reported, including periods dating back to 2009, for which [Ms. Fancher] has provided no documentation. Solely for purposes of our calculation, we credited this reporting to the period January 1, 2011 through December 31, 2022 and, still found that [Ms. Fancher] underreported Mayorga's earnings by $36,187 during the same period.

*2024 Boschan Report*, pp. 20-21 [Ex. 39].

The 2025 Boschan Schedules summarizes the calculations supporting Ms. Boschan's $36,187 figure in Schedule 4, entitled "Underreported Digital Uses." *2025 Boschan Schedules*, p. 10 [Ex. 83]. To reach the $36,187 figure, Ms. Boschan first added up all the sound recording royalties for digital streaming that Ms. Fancher's digital distributors reported as payable to her, coming up with $650,402. *Id*., pp. 29-33. Ms. Boschan then multiplied that sum by 10% to determine the amount of sound recording royalties for digital streaming that Ms. Fancher would have owed to Mr. Mayorga pursuant to the Recording Agreement. Finally, she credited the $28,853 that Ms. Fancher reported to Mr. Mayorga from 2009 through 2022. *Id*., p. 11.

However, as analyzed above, Mr. Mayorga's claim for fraud is not actionable after December 2016, when he stopped relying on Ms. Fancher's representations and commenced the Royalties Action against her. Accordingly, the relevant total sound recording royalties for digital streaming that Ms. Fancher's digital distributors reported as payable to her is $174,560. *See id*., pp. 29-33. Multiplying that sum by 10%, the amount of sound recording royalties for digital streaming that Ms. Fancher would have owed to Mr. Mayorga pursuant to the Recording Agreement is $17,456. The relevant amount to be credited as reported to Mr. Mayorga is $8,669. *See id*., p. 11. Accordingly, Mr. Mayorga suffered actual damages in the amount of $8,787 for Ms. Fancher's fraudulent concealment of unpaid sound recording royalties for digital streaming.

### 2.    *Punitive Damages*

Mr. Mayorga cites *In re Butcher*, 200 B.R. 675 (Bankr. C.D. Cal. 1996), *aff'd,* 226 B.R. 283 (B.A.P. 9th Cir. 1998) for the proposition that he is entitled to punitive damages in the amount of $2,500,000. *Plaintiff's Closing Brief*, pp. 25-26 [doc. 224]. *Butcher* is inapposite to

the facts before this Court. In *Butcher*, the bankruptcy court awarded punitive damages to a plaintiff who prevailed on a § 523(a)(6) cause of action concerning conversion. 200 B.R. at 679-80. Here, the Court dismissed Mr. Mayorga's claims under § 523(a)(6). *Order on Motion to Dismiss* [doc. 20]; *Court's Ruling on Motion to Dismiss* [doc. 16]. Mr. Mayorga has not otherwise established his entitlement to punitive damages.

### 3. Emotional Distress Damages

Mr. Mayorga also seeks emotional distress damages in the amount of $500,000. *Plaintiff's Trial* Brief, pp. 19-20 [doc. 159]. Mr. Mayorga cites no authority in support of his contention that he is entitled to such damages. *Plaintiff's Closing Brief*, pp. 26-27 [doc. 224]. In any event, Mr. Mayorga has not established that he has suffered emotional distress as a result of Ms. Fancher's conduct. He testified that he never visited a therapist for his emotional distress. He also stated that he had many stressors in his life unrelated to Ms. Fancher's conduct, including being kicked out of the Band.

### 4. Attorney's Fees and Costs

Pursuant to Cal. Civ. Code § 1717, Mr. Mayorga is entitled to reasonable attorney's fees and costs; all three elements are satisfied such that the statute applies to the attorney's fee provision in the Recording Agreement.

Taking into account the liberal construction of the term "action on a contract" by California courts, *see Baroff,* 105 F.3d at 442-43, the Court finds that the first element is satisfied. As set forth above, the Recording Agreement was central to the Court's determination that Ms. Fancher made a fraudulent misrepresentation. The second element is satisfied because the Recording Agreement requires Mr. Mayorga to pay Ms. Fancher's attorney's fees "resulting from any claimed breach by [Mr. Mayorga] of this agreement or of any of the representations or warranties of [Mr. Mayorga] contained herein." *Recording Agreement*, p. 6 [Ex. 6]. Regarding the third element, Mr. Mayorga "recovered a greater relief" in this adversary proceeding because he successfully prosecuted his cause of action under § 523(a)(2)(A).

Accordingly, pursuant to the Court's *Order Denying Defendant's Motion to Bifurcate Trial* [doc. 74], Mr. Mayorga may submit any additional evidence regarding the reasonable

1    attorney's fees and costs incurred. In determining whether any such fees and costs were

2    reasonable and appropriate, Mr. Mayorga bears the burden of proof.

3           **5.**      ***Prejudgment Interest***

4       In consideration of fairness, the Court also will award Mr. Mayorga prejudgment interest

5    on Plaintiffs' actual damages, but not Mr. Mayorga's attorney's fees and costs. *See Acequia*, 34

6    F.3d at 818; *Levy-Zentner*, 74 Cal. App. 3d at 798. The Court, in its discretion, declines to apply

7    a rate other than the federal interest rate. *See Acequia*, 34 F.3d at 818.

8       Pursuant to 28 U.S.C. § 1961, for the week preceding the date Mr. Mayorga commenced

9    the Royalties Action, the federal rate was 0.79%. *See Selected Interest Rates Instruments, Yields*

10   *in percent per annum: Weekly*, Fed. Rsrv. Bank of St. Louis,

11   https://fred.stlouisfed.org/release/tables?rid=18&eid=290&od=2016-12-08 (select "U.S.

12   government securities," then "Treasury constant maturities," then "Nominal," then "1-year," then

13   view column "Preceding Period") (last visited July 29, 2025). Applying the 0.79% federal

14   interest rate on the allowed principal of \$8,787 yields a daily rate of interest in the amount of

15   \$0.19 ((\$8,787 × 0.79%) ÷ 365) = \$0.19). There are 3,186 days from December 8, 2016, to

16   August 28, 2025, the date for which the Court scheduled a hearing on the trial ruling.

17   Accordingly, the Court will award Plaintiffs \$605.34 in prejudgment interest (\$0.19 × 3,186 =

18   \$605.34).

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1  **IV.    CONCLUSION**

2      Under 11 U.S.C. § 523(a)(2)(A), the Court will enter judgment in favor of Mr. Mayorga.

3  Under 11 U.S.C. § 523(a)(4), the Court will enter judgment in favor of Ms. Fancher.

4      **No later than September 4, 2025**, Mr. Mayorga must file and serve on Ms. Fancher a

5  declaration authenticating an itemized statement of the reasonable attorney's fees and costs that

6  Mr. Mayorga incurred. **No later than September 18, 2025**, Ms. Fancher may file and serve on

7  Mr. Mayorga a response to the declaration **only as to the reasonableness of Mr. Mayorga's**

8  **incurred fees and costs**. **No later than October 2, 2025**, Mr. Mayorga may file and serve on

9  Ms. Fancher a reply to her response.

10      The Court will set a hearing concerning Mr. Mayorga's reasonable attorney's fees and

11  costs at **2:00 p.m. on October 9, 2025**.

12                                         # # #

23

24      Date: July 30, 2025                    Victoria S. Kaufman
                                               United States Bankruptcy Judge

-37-